1
2
3
4
5
6
7          **UNITED STATES DISTRICT COURT**
8              **DISTRICT OF NEVADA**
9
10  UNITED STATES OF AMERICA,
11          Plaintiff,                          Case No. 3:73-cv-183-LDG
                                                 Case No. D-183-LDG
12  v.
                                                 Sub-File 3:73-cv-206-LDG
13  ALPINE LAND & RESERVOIR CO., *et
    al.*,                                        **ORDER**
14
            Defendants.
15  _____
16  In Re: Nevada State Engineer Ruling
    No. 5857
17  _____
18
19          In Ruling No. 5857, issued May 30, 2008, the Nevada State Engineer denied seven
20  applications filed by the United States Fish and Wildlife Service (the "Service") to change
21  the place of use of certain Carson River water rights to the Stillwater National Wildlife
22  Refuge.  Each of the applications identified the source of the water as the Carson River.
23  Each of the applications described the point of diversion as the Buckland Ditch, in Segment
24  7(e) of the Carson River.  An attachment to each of the applications stated that "[w]ater will
25  be diverted at the point of diversion when in priority and will be conveyed downstream
26  through the Carson River, Lahontan Reservoir and thence to the proposed place of use via

the existing river channel and canals as illustrated on the map filed in support of this application."

In denying the applications, the State Engineer found that the actual point of diversion of the water from the Carson River was not the Buckland Ditch, as proposed on the applications, but most likely the Carson Dam, a point "downstream of Lahontan Dam and some 36 miles downstream of Buckland Ditch."  Accordingly, the State Engineer determined that the applications were flawed.  The State Engineer further concluded that, "as filed," the applications could allow for a senior priority in one segment of the river (Segment 7(e)) to be enforced against a junior priority, and thus ruled that issuing the applications "would conflict with existing rights and threaten to prove detrimental to the public interest."

Having considered the arguments of the parties and the record, the Court will deny the petition and affirm the ruling of the State Engineer.

<u>Jurisdiction</u>

The Court has jurisdiction over the underlying quiet title action pursuant to 28 U.S.C. §1345, as the action was brought by the United States.  The Court has jurisdiction to hear the present petition pursuant to its continuing jurisdiction to administer and enforce the final decree entered in the quiet title action, as specifically set forth under Section VII of the Administrative Provisions of the *Alpine Decree*.

<u>Standard of Review</u>

In reviewing the decision of the State Engineer, this Court considers that decision as "prima facie correct, and the burden of proof is upon the party" challenging the Engineer's decision.  N.R.S. 533.450(10); *see also Alpine Decree*, Administrative Provisions Par. 7; *Town of Eureka v. State Engineer*, 108 Nev. 163, 165, 826 P.2d 948, 949 (1992).  State law controls as to both procedural and substantive issues. "The Alpine decision necessarily contemplated that state law would control both the process and the substance of a

2

1   proposed transfer of water rights." *United States v. Alpine Land & Reservoir Co.*, 878 F.2d

2   1217, 1223 (9th Cir. 1989) (*Alpine II*).  As the Ninth Circuit has recognized, "state law will

3   control the distribution of water rights to the extent there is no preempting federal directive."

4   *United States v. Alpine Land & Reservoir Co.*, 697 F.2d 851, 858 (9th Cir. 1983) (*Alpine I*)

5   *citing California v. United States*, 438 U.S. 645 (1978).

6         The Court reviews the evidence on the record under a deferential standard, and will

7   sustain the State Engineer's decision if substantial evidence supports it. *United States v.*

8   *Alpine Land & Reservoir Co.*, 919 F.Supp. 1470, 1474 (D. Nev. 1996); *State Engineer v.*

9   *Curtis Park Manor Water Users Ass'n.*, 101 Nev. 30, 692 P.2d 495, 497 (1985); *Town of*

10   *Eureka*, 826 P.2d at 949. Substantial evidence is that evidence which a reasonable mind

11   might accept as adequate to support a conclusion. *Bacher v. State Engineer*, 146 P.3d

12   793, 800 (Nev. 2006). The Court will not substitute its judgment for that of the State

13   Engineer by either re-weighing the evidence or determining the credibility of witnesses.

14   *State Engineer v. Morris*, 107 Nev. 699, 701, 819 P.2d 203, 205 (1991).

15         This Court is free, however, to decide purely legal issues or questions without

16   deference to the State Engineer's decision.  *Town of Eureka*, 826 P.2d at 949 (citing

17   *Jones v. Rosner*, 102 Nev. 215, 217, 719 P.2d 805, 806 (1986)). Thus, "while the State

18   Engineer's interpretation of a statute is persuasive, it is not controlling."  *Id.,* at 950.

19         <u>Analysis</u>

20         As part of its effort to restore and sustain the Lahontan Valley wetlands, the Service

21   purchases water rights from willing sellers, and then applies to transfer those water rights

22   for application in the Stillwater National Wildlife Refuge.  As the present matter establishes,

23   the Service would prefer to retain the priority of the water right when making this transfer.

24   Generally, a water right that can be and is transferred from one place of use to another will

25   retain its priority of right.  *See* N.R.S. §533.040(2).

26

1   A change in place of use of a Carson River water right, however, presents a unique

2   circumstance when the change is between the different segments of the Carson River that

3   were established in the *Alpine Decree*.  The *Decree* divided the Carson River into eight

4   segments.  Finding of Fact IX.  Each segment is administered "in accordance with

5   established practices, customs, agreements and decrees."  Finding of Fact X.1(d).  As

6   explained by the court:

> The evidence presented by the defendants showed that through years of
> practical experience and cooperation, the farmers have developed a
> reasonable and workable system of water distribution.  The evidence showed
> that the historic practices are highly efficient, practical and enhance the
> maximum beneficial use of the water.  This Court approves and adopts the
> customs, practices, agreements and decrees set forth in the Decree; the
> Water Master is directed to include these practices in his administration of the
> river.

*United States v. Alpine Land & Reservoir Co.*, 503 F.Supp. 877, 891 (D.Nev. 1980).

The Court also determined that "[w]hen the river is on regulation each segment of

the river is treated autonomously."  Find of Fact X.1(e).  The court also explained its

reasoning for this requirement:

> The evidence shows that the physical characteristics of the Carson
> River do not nicely conform to strictly traditional legal concepts of enforcing
> priorities.  Under a pure or theoretical view, a senior priority appropriator on a
> river should never go without water when a junior priority appropriator has
> water.  The Carson River system presents several obstacles to the
> application of this theoretical concept.
>
> First, the upper reaches of the river are separated into two forks: the
> East Fork and the West Fork.  These different branches of the river are, until
> close to their confluence, separated by a considerable distance and varied
> topography, including steep foothills.  An example, then, of the difficulties
> presented is a situation where there is a senior appropriator on the West Fork
> and a junior appropriator on the East Fork and the senior user is low on water
> yet the junior user has a full supply.  There is no physical way to deprive the
> junior user to satisfy the senior user.
>
> A second example of the peculiarities of the river system is the late
> season appearance and disappearance of water from the river bed.  The
> testimony indicated that in the late summer when the river is quite low, the
> river bed will be entirely dry for some stretches but that water reappears
> further downstream.  The reappearance of water is the result of underground
> drainage from upstream irrigation or surface return flows from irrigation.  This

4

water is then available for use further downstream.  This state of affairs makes it virtually impossible to "bring" water from an upstream junior appropriator down to a senior appropriator.

*Id.,* 503 F.Supp. at 892.  Accordingly, the court resolved "a conflict between the pure theory of priority rights and the practical realities of the river system" by dividing the Carson River into eight segments and requiring that each segment be administered autonomously when the River was on regulation.  *Id.*

Finally, the court provided an example of the impact of autonomous regulation of each segment: "the Water Master shall distribute water for Segment 3 in accordance with the priorities in the limits of Segment 3.  The Water Master shall not enforce a senior priority in one segment of the river against a junior priority in another segment of the river." *Id.*

In the seven applications at issue in this petition, the Service sought to change the place of the beneficial use of the transfer water rights from Segment 7(e) to Segment 8. The Service apparently anticipated that the unique circumstances of a Carson River water right, as imposed by the *Alpine Decree*, would include the loss of priority when the water right was transferred from one segment to another.  In an attempt to avoid this outcome, the Service identified the Buckland Ditch, a location on the Carson River within Segment 7(e), as the proposed point of diversion on each of the seven applications.[1]  As the State Engineer concluded, however, "the proposed point of diversion on the applications and as illustrated on the supporting map do not reflect the Applicant's intended point of diversion of water from the Carson River."  Rather, the "actual point of diversion is most likely the Carson Dam diversion structure, which is located downstream of Lahontan Dam and some 36 miles downstream of Buckland Ditch."  Reflecting an awareness of the Service's

---

[1]      For five of the applications, the Buckland Ditch was the prior location at which water had been diverted.  For the other two applications, the point of diversion was at other locations on the Carson River within Segment 7(e).

1   purpose, the State Engineer concluded: "to establish an imaginary or made-up point of

2   diversion for the purposes of retaining priority would violate the *Alpine* Decree and Nevada

3   water law and therefore, would threaten to prove detrimental to the public interest."

4        The Service argues, in its petition, that the State Engineer erred in concluding (as

5   the Service had apparently anticipated the State Engineer would conclude) that a transfer

6   of a water right from one segment of the Carson River to another would result in a loss of

7   priority.  The Service further argues that contrary to the State Engineer's conclusions, the

8   Buckland Ditch diversion point was a valid point of diversion because "[w]hile the water is

9   not physically diverted at Buckland Ditch, it is diverted for administrative and accounting

10  purposes."  Finally, the Service argues that the State Engineer erred in concluding that the

11  proposed change "could" result in harm to existing rights and that, in any event, the State

12  Engineer should have imposed conditions, rather than deny the applications, to avoid the

13  potential harm.

14       The Court will deny the Service's petition.  A transfer of a water right from one

15  segment to another of the Carson River results in that water right losing its priority within

16  the new segment.  In addition, as found by the State Engineer, construing or establishing

17  Buckland Ditch and not the Carson Dam (or other point of actual diversion) as the point of

18  diversion would be contrary to Nevada water law and the *Alpine Decree*.  Finally, the State

19  Engineer did not apply an incorrect legal standard, but found that harm would result from

20  the proposed change "as filed."

21       Section 533.040(2) permits the transfer of place of beneficial use "without losing

22  priority of right."  The provisions of the *Alpine Decree*, however, require that the eight

23  segments of the Carson River be treated autonomously when the river is on regulation.

24  The Water Master cannot enforce a senior priority awarded in one segment of the river

25  against a junior priority awarded in another segment of the river.  In this respect, the *Alpine*

26  *Decree* awarded a limited right of priority.  As noted, this limitation was a necessary

modification of the pure priority concept in order to avoid the waste of large amounts of water and other resources and to allow for the practical administration of the entire river. Consistent with §533.040(2), this limited right of priority is retained so long as the water right is beneficially used within the segment in which it was awarded.  The diversion of a water right outside of the segment in which it was originally awarded, however, requires the application of a priority consistent with the *Alpine Decree* and its requirement limiting the enforcement of priority to one segment while the River is on regulation.  The priority awarded in the old segment cannot continue to be exercised as against the old segment, because the water is no longer being diverted within the old segment.  Similarly, the priority awarded in the old segment cannot be exercised when the water is diverted in a new segment without violating the *Alpine Decree*'s prohibition against enforcement of a priority of one segment against the priority of another segment.  To continue to recognize the date of priority despite the change of segments is contrary to the very purposes of avoiding waste while permitting a practical administration on a river system that has atypical physical characteristics precluding the strict application of priority.  The State Engineer did not err in finding that the *Alpine Decree*, and this court's accompanying opinion, require that a change in point of diversion from one segment to another must result in a corresponding change of the priority date to the date of application for the change.

The Service argues that the State Engineer erred in relying upon an extra-record comment made by the Federal Water Master to the State Engineer during a conference regarding the historical practice of requiring a change of date of priority.  Whether the date of priority is lost, however, is a question of law concerning the *Alpine Decree* and the reference to an extra-record explanation of historical practice is irrelevant to resolving that question.  The State Engineer correctly construed the *Alpine Decree* and its accompanying opinion regarding the loss of priority when the point of diversion is changed from one segment to another.

Throughout its briefs, the Service uses the terms "physically diverted" and "physical diversion."  In the context of water law, however, the use of "physical" and "physically" as modifiers is largely redundant and meaningless.  The diversion of water from its source to a new channel to be transported to a place of application is, in its essential character, a physical act.

The protestants refer to Buckland Ditch as a "fictitious" point of diversion.  As noted above, the State Engineer referenced Buckland Ditch as an "imaginary or made-up" point of diversion.  The Service identifies Buckland Ditch as the point on the Carson River where it would "administratively," but not physically, divert water.  Nevertheless, the Service admits that it intended to physically divert water from the Carson River, just not at Buckland Ditch.[2]  Accordingly, the Service's arguments rest upon two fundamental premises: (1) that Nevada water law recognizes a point of "constructive" diversion, and (2) that an appropriator can designate the point of *constructive* diversion, rather than the actual point of *physical* diversion, as "the point of diversion" when the underlying beneficial use will require a physical diversion of the water.

The Court recognizes that the Service has not expressly referenced Buckland Ditch as a point of constructive diversion.  Indeed, the Service has not even argued that Nevada water law recognizes a point of constructive diversion.  Nevertheless, that is fundamentally the object of the Service's arguments.  Black's Law Dictionary defines "constructive" as "[t]hat which has not the character assigned to it in its own essential nature, but acquires such character in consequence of the way in which it is regarded by a rule or policy of law."  In the context of water law, the essential nature of a diversion of water is the act of

---

[2]    The State Engineer expressly found that the Service intended to divert water from the Carson River at a location other than the Buckland Ditch, and most likely the Carson Dam diversion structure.  The Service has not argued that this was error.  Further, the record confirms that the State Engineer was correct in its finding.

physically turning aside the water from its source into a new channel.[3]  As the Service

concedes that it will not be physically diverting water at Buckland Ditch, Buckland Ditch can

only be, at most, a point of *constructive* diversion; that is, a point at which water will not be

diverted but nevertheless will be regarded by rule or policy of law as the point at which

water will be diverted.  Stated conversely, Buckland Ditch could be nothing more than a

fictitious, imaginary or made-up point of diversion unless Nevada water law could regard it

as a point of constructive diversion.

The Service argues that Nevada water law does not require a physical diversion of

water to appropriate water.  The Service even notes that the State Engineer correctly

recognized this.  The Service argues, however, that the State Engineer erred "in

determining that these cases only apply to water used *in situ*" because "the statutes the

court [in *State Bd. of Agric. v. Morros,* 766 P.2d 263, 266 (Nev. 1988)] analyzed do not

differentiate between *in situ* and other uses, and the court did not make such a distinction."

The argument fails for several reasons.  First, the argument is irrelevant.  The issue in this

matter is not whether a diversion is required to appropriate water (the issue addressed in

*Morros*).  The Service does not dispute that it will be diverting water from the Carson River.

The relevant issue, as raised in this matter, is whether an applicant (either to appropriate

water or to otherwise change the permitted water right) can identify and require the State

Engineer to recognize, as the point of diversion, a location on the river <u>other than</u> the point

at which it will be diverting water.  That a diversion is not required to appropriate water does

not lead to the conclusion that an applicant who will be diverting water from a river can

designate some point on the river–convenient to itself but unrelated to the place at which it

will actually divert water–as the place of diversion. Second, if even the holding of *Morros*

---

[3]       That an *in situ* beneficial application of water does not require a physical
diversion of water does not alter the conclusion that a diversion of water, when required for
the beneficial use of water, is a physical act upon the water.

1   was somehow relevant, the context of *Morros* was an *in situ* beneficial use of water, and

2   thus the court did not need to address issues concerning the diversion of water when the

3   beneficial use required the diversion of the water from the source to its place of application.

4   Finally, contrary to the Service's characterization of *Morros*, the court did limit its holding to

5   the *in situ* appropriation of water, stating "we hold that Nevada water law recognizes and

6   permits water appropriations *in situ*, without a diversion, for public recreation purposes."

7   The entirety of the court's reasoning recognized that "under certain conditions it could

8   recognize an appropriation of water without a diversion when no diversion was needed to

9   put the water to beneficial use." *Morros*, at 267 (referencing *Steptot Live Stock Co. v.*

10  *Gulley,* 53 Nev. 163, 295 P. 772 (1931)).  Nothing in *Morros* suggests that when a physical

11  diversion was needed to put the water to beneficial use, an applicant could nevertheless

12  designate, as the point of diversion, some different point of constructive diversion.

13       Accordingly, the State Engineer did not err in finding that "establish[ing] an

14  imaginary or made-up point of diversion for the purposes of retaining priority would violate

15  . . . Nevada water law and therefore, would threaten to prove detrimental to the public

16  interest."

17       The Service's further argument that the State Engineer erred by applying the wrong

18  legal standard is without merit.  The State Engineer ruled that the issuance of the

19  applications would conflict with existing rights.  The State Engineer's conclusion that

20  granting the applications could potentially conflict with existing water rights was correct,

21  reflecting that under certain circumstances the exercise of the Service's water rights would

22  conflict with existing rights.  This conflict resulted primarily because the Service was

23  improperly attempting to change the place of diversion from one segment to another

24  without losing priority.  The State Engineer correctly determined both that the change of

25  point of diversion from one segment to another would require the loss of priority, and that

26  the Service would actually be diverting the water within a new segment and not within the

old segment as indicated on the applications.  Accordingly, the State Engineer did not err in finding that granting the applications as filed would harm existing rights.

Finally, the Court cannot agree that the State Engineer erred in denying the applications rather than granting them with conditions.  The Service filed applications that, as subsequently established by evidence received at the hearing, did not provide a substantially accurate description of the location of the diversion.  The Service has not shown that the State Engineer could impose any conditions protecting the public from the adverse impact of granting an application that, as filed, was contrary to Nevada law and the *Alpine Decree*

Therefore, for good cause shown,

THE COURT **ORDERS** that the United States Fish and Wildlife Service's Petition challenging the Nevada State Engineer's Ruling No. 5857 is DENIED.

DATED this 21 day of September, 2012.

_____
Lloyd D. George
United States District Judge

11